**In re Paul S. HAAR, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 96–BG–307.**

District of Columbia Court of Appeals.

Argued Dec. 13, 1996.

Decided July 17, 1997.

---

H. Clay Smith, III, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, was on the brief, for petitioner, Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, Board of Professional Responsibility, for the Board.

Jacob A. Stein filed a statement adopting the Board's brief for respondent.

Before FERREN, STEADMAN, and RUIZ, Associate Judges.

FERREN, Associate Judge:

In *In re Haar,* 667 A.2d 1350 (D.C.1995) (hereinafter *Haar I* ), we concluded that Paul S. Haar, a member of the Bar of the District of Columbia, had violated Disciplinary Rule 9–103(A)(2) then in effect, forbidding an attorney to withdraw funds that allegedly belonged to the attorney from an account holding funds belonging both to the attorney and to the client, when the attorney's right to the claimed funds "is disputed by the client." [1] We remanded to the Board on Professional Responsibility for recommendation of an appropriate sanction. *See id.* at 1355. The Board has now recommended an informal admonition. Bar Counsel excepted, calling for a ninety-day suspension. In our view of the case, a thirty-day suspension is required.

## I.

The facts are set forth in *Haar I,* 667 A.2d at 1351–52. Briefly, Haar represented Krishna Baldew, a Surinamese national, in a dispute concerning her termination as an employee of the United States Information Agency (USIA) at the United States Embassy in Surinam. Haar obtained a settlement for Baldew wherein USIA agreed to purge Baldew's personnel file of derogatory information and to compensate her in the amount of $20,000. Haar submitted a $12,921.75 bill for his services to Baldew. Baldew disputed the amount, offering to settle for $4,000. Haar agreed to accept $10,161.75. Further attempts to settle the dispute proved unsuccessful. After the settlement with USIA, Haar received three checks for $1,629.19, $14,503.97, and $3,866.84, respectively, the first two payable to Haar and Baldew jointly, the third payable only to Baldew. Haar informed Baldew in writing that he intended to forward $3,866.84 to her and to put the $16,133.16 balance into a trust account from which he would withdraw the "undisputed" $4,000 portion of his fee. Having received no response from Baldew, Haar withdrew the

$4,000. That withdrawal provided the basis for this disciplinary action in light of what subsequently happened.

Haar wrote to Baldew that he had withdrawn the $4,000 and would withdraw an additional $6,161 from the trust account in full settlement unless Baldew objected. Baldew replied that she had agreed only to $4,000 as full and final settlement, not to Haar's proposed $10,161.75. She demanded that Haar restore the $4,000 to the trust account. He did not do so. Haar ultimately obtained a default judgment against Baldew for his full fee, $12,921.75, plus interest and costs.

In *Haar I*, we declined to accept the Board's view that no violation of DR 9–103(A)(2) had occurred.[2] The Board had found no violation because it perceived no "dispute" over Haar's claimed right to the $4,000 within the meaning of DR 9–103(A)(2). The Board premised its finding on a legal interpretation that the word "dispute" had to mean "genuine" dispute, which was not the case here, it said, because Haar had been legally entitled to at least the $4,000. *See Haar I*, 667 A.2d at 1353. We disagreed with the Board's interpretation.

> The rule is unambiguous: an attorney may not withdraw a portion of the deposited funds when the attorney's right to receive that portion is "disputed" by the client. DR 103(A)(2). There is no requirement that the dispute be "genuine," "serious," or "bona fide," as the Board concluded.

*Id.* Thus, we held, the test was not whether respondent was "legally entitled to the amount claimed" but whether there merely "was in fact a fee disagreement between the parties concerning respondent's entitlement to the [$4,000] amount withdrawn at the time of withdrawal." *Id.* We concluded that there was such a disagreement at the time of the withdrawal that Haar negligently avoided learning about:

> In our view, respondent was on notice that he would be running the risk, under these circumstances, that his client, if asked, would disapprove of his withdrawal of any money from the account in the absence of an affirmative agreement on the amount authorized. Before making any withdrawal, therefore, respondent should have obtained a clear and unequivocal agreement from Ms. Baldew that it was acceptable for him to do so.

. . . . .

> Respondent's election not to telephone Ms. Baldew, and to rely instead on a self-serving assumption that Ms. Baldew's silence meant assent, constituted a resort to self-help. Respondent eschewed readily available means of ascertaining whether her consent had in fact been given. But respondent owed a fiduciary duty to Ms. Baldew. His unilateral action under these circumstances was contrary to the Disciplinary Rule.

*Id.* at 1354.

We therefore remanded for the Board to recommend an appropriate sanction. *See id.* at 1355. We noted, however, that we did not necessarily endorse the Hearing Committee's recommendation of a six-month suspension, and that the Board could consider, in light of factual findings after the hearing, that it was "now undisputed, that respondent had earned in excess of $4,000" from representing Baldew. *See id.* at 1355 n. 5. On remand, the Board concluded that, given the nature of the violation and various mitigating factors, an informal admonition was the appropriate

---

**2.** DR 9–103(A)(2), which applied at the time of Haar's actions, provided in relevant part:

(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

. . . . .

(2) Funds belonging in part to a client and in part, presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

*Haar I*, 667 A.2d at 1352.

sanction. *See* D.C. Bar R. XI §§ 3, 6, 8. Bar Counsel excepted, suggesting that "a 90–day suspension is the least severe sanction warranted by Respondent's misconduct."

## II.

■ "We are bound to accept the recommended disposition of the Board 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Confidential (J.E.S.)*, 670 A.2d 1343, 1346 (D.C.1996) (quoting D.C. Bar R. XI § 9(g)(1)). We conclude that Haar's conduct amounted to a variant of negligent misappropriation of client funds. Because we agree, however, that there were mitigating factors—several more than Bar Counsel acknowledged but fewer than the Board found—we have decided that a thirty-day suspension is the appropriate sanction.

Bar Counsel argues that we should regard the nature of the offense as intrinsically more serious than the Board did in considering appropriate discipline. Bar counsel analogizes this violation both to negligent misappropriation of funds, where the respondent has "an honest but mistaken belief" that he or she may withdraw funds, *see In re Evans*, 578 A.2d 1141, 1143 (D.C.1990) (per curiam) (six-month suspension), and to technical commingling where a client's settlement check is deposited in the lawyer's personal bank account containing "funds other than client funds," *see In re Ingram*, 584 A.2d 602, 603–04 (D.C.1991) (per curiam) (public censure). He then argues that Haar's conduct falls somewhere in between.

■ In considering Bar Counsel's analogy, we note first that misappropriation concerns the actual taking of client funds, whereas commingling involves placement of client funds in the attorney's personal bank account with the attendant risk of misappropriation. *See In re Hessler*, 549 A.2d 700, 701–02 (D.C.1988). This case arguably is different, at least initially, from either one in that

Haar deposited the settlement proceeds in a trust account consistent with the requirements of DR 9–103(A). By charging Haar with a violation of that rule, Bar Counsel must have believed that the money Haar withdrew at least potentially represented a "portion belonging to the lawyer or law firm"; otherwise, the withdrawal would have been a classic misappropriation. This situation, therefore, appears to reflect Bar Counsel's perception that Haar had retained a so-called "charging lien" whereby client and attorney have agreed to earmark a particular fund or property as security for a fee agreement. *See District of Columbia Redevelopment Land Agency v. Dowdey*, 618 A.2d 153, 159 (D.C.1992).

More specifically, if the parties in fact agreed that these proceeds belonged in part to Baldew and in part "presently or potentially" to Haar, then "the portion belonging to [Haar could] be withdrawn when due" unless Baldew disputed his right to receive the particular amount claimed, in which event Haar could not withdraw the disputed portion until the dispute was "finally resolved." DR 9–103(A)(2). Accordingly, if all the requirements of this rule were met, Haar had authority to withdraw funds undisputedly his from a trust account he properly shared with his client—a situation that clearly differs from misappropriation, as well as from commingling (where a lawyer has no right to deposit client funds in the account, let alone withdraw money from it once the commingling has occurred).[3]

■ If, on the other hand, the settlement proceeds cannot be said to have belonged "presently or potentially" to Haar—i.e., if there was no agreement that Haar was entitled to take his fee from the trust account holding the settlement proceeds—then this would be a clear case of misappropriation, because Haar would have taken client funds over which he had no claim greater than that of a general creditor.[4]

---

**3.** *See In re Choroszej*, 624 A.2d 434, 437–38 (D.C. 1992) (Wagner, J., concurring) (concluding that lawyer who deposited settlement funds in trust account, consistent with DR 9–103(A)(2), and negligently removed more than amount of his fee

when writing checks to his creditors, violated rule against misappropriation but not rule against commingling).

**4.** It is true that, even if Haar and Baldew had not agreed that his fee would come from the deposit-

There is, however, a third possibility. How should we characterize for disciplinary purposes the situation where (1) unlike commingling, the funds are properly deposited in a lawyer-client account, and (2) the parties agree that at least some of the funds "presently or potentially" belong to the lawyer for a fee, but (3) the client disputes the lawyer's right to withdraw the particular amount taken? Is that withdrawal technically a "misappropriation," requiring as a sanction at least some form of suspension from the practice of law, even when based on an honest but negligently mistaken belief of entitlement to the funds?

■ We must agree with Bar Counsel that this hypothetical set of facts will result in a form of misappropriation of client funds to the extent that the amount taken exceeds an agreed-upon fee, because misappropriation includes " 'any unauthorized use of client's funds entrusted to [the lawyer].' " *In re Buckley*, 535 A.2d 863, 866 (D.C.1987) (alteration in original) (quoting *In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983)). This is the first case, however, in which the Board, and thus this court, has been asked to apply the DR 9–103(A)(2) exception to the general rule of DR 9–103(A), which serves as the basis for charges of commingling and misappropriation. *See In re Micheel*, 610 A.2d 231, 233 (D.C.1992) (finding commingling and misappropriation both violations of DR 9–103(A)); *In re Hines*, 482 A.2d 378, 380 (D.C.1984)

(same); *see also Ingram*, 584 A.2d at 602 (finding commingling without misappropriation); *In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc) (finding misappropriation without commingling).

We cannot say that DR 9–103(A)(2) grants an attorney any greater right to withdraw money from an account to which a client also has a claim than the attorney otherwise would have; indeed, DR 9–103(A)(2) itself incorporates the traditional rule forbidding an attorney to withdraw funds from a joint lawyer-client account unless the client agrees. *See In re Addams*, 579 A.2d at 192 (incorporating part of division opinion in *In re Addams*, 563 A.2d 338, 339–41 (D.C.1989) (concluding that where retainer agreement authorized attorney to withdraw fees from money collected and deposited in trust account to satisfy judgments owed to client, misappropriation occurred when attorney also withdrew for other personal purposes money deposited in trust account)); CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 4.8, at 182 (1986) [5]; *cf. In re Pierson*, 690 A.2d 941, 949 (D.C.1997) (finding misappropriation when attorney took client funds for personal use absent specific agreement, even where client later retroactively approves); *Evans*, 578 A.2d at 1149–50 (concluding that side agreement with client to withdraw client funds was permissible, but required consent of all clients). To the extent the withdrawal

ed settlement funds, Haar would have had a so-called "retaining lien," which attaches to particular funds or papers, belonging to the client, that come into the attorney's possession. *See Wolf v. Sherman*, 682 A.2d 194, 197 (D.C.1996); *Lyman v. Campbell*, 87 U.S.App. D.C. 44, 45–46, 182 F.2d 700, 701–02 (1950); District of Columbia Bar Legal Ethics Op. No. 100 at 172, 173 n. 5 (1984) (providing that attorney may assert retaining lien on client assets in attorney's possession but may not ethically deduct fee from client funds held in escrow absent "a specific agreement between the attorney and client" permitting the withdrawal) (quoting ABA Committee on Ethics, Informal Op. No. 859, Aug. 4, 1965). Under the retaining lien regime, however, the client retains all interest and ownership in the money or property the attorney holds, and the attorney may take no step to seize the property without resort to the court, because the attorney has standing no greater than that of any other common law lien holder. *See Wolf*, 682 A.2d at 197 n. 8. We do not address here whether the

retaining lien can be asserted against funds committed in escrow to the attorney for some other purpose. *See, e.g., Florida Bar v. Bratton*, 413 So.2d 754 (Fla.1982) (concluding that client funds entrusted to lawyer for posting bond in foreclosure proceeding not subject to retaining lien for attorney's fees upon release of bond money to lawyer, because client had entrusted funds to lawyer for specific purpose, without agreement for payment of fees therefrom).

5. According to Professor Wolfram:

A lawyer may withdraw from a trust account funds to which the lawyer is entitled as compensation. But such a withdrawal should be made only when the lawyer and client have clearly agreed (1) that the lawyer has a right to withdraw the funds for that purpose; (2) that the amount proposed to be withdrawn is the correct amount; and (3) that the time for withdrawal is appropriate.

WOLFRAM, *supra*, § 4.8, at 182 (footnote omitted).

"is disputed by the client," there is, necessarily, a DR 9–103(A) misappropriation.

We do not understand the Board to question this understanding, because its initial ruling that the subsection (2) exception applied here was premised only on the legal proposition (which we rejected in *Haar I*) that a subsection (2) dispute must be a "genuine" disagreement over legal entitlement to the sum withdrawn, rather than (as we held) simply a dispute in fact as to whether the client had consented to the withdrawal. Accordingly, we must determine what sanction to impose here, given that Haar—who took "disputed" money—must be said to have misappropriated at least some of his client's funds, within the meaning of DR 9–103(A)(2).[6]

### III.

■ We have said that "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *In re Addams*, 579 A.2d at 191. In single instances of negligent misappropriation (and no other ethical violation), our sanctions have uniformly been six-month suspensions, without indicating whether a suspension of six months (or perhaps a lesser suspension) would be the minimum sanction a negligent misappropriation requires. In *Haar I*, however, without characterizing Haar's withdrawal as a misappropriation, we premised our decision on Haar's negligent, not intentional, violation of DR 9–103(A)(2) and indicated that, in this particular case, the Board would not necessarily have to impose a six-month suspension. To that extent, at least, the door to less than a six-month suspension for this particular form of negligent misappropriation has been opened.

Because disbarment for misappropriation is the norm unless it resulted from simple negligence, *see In re Addams*, 579 A.2d at 191, it is important, in determining the appropriate sanction, to ascertain whether

Haar in fact had a legitimate claim to the settlement proceeds *as such*, i.e., whether lawyer and client had an understanding that, whatever the attorney's fee turned out to be, it would come from the $20,000 settlement proceeds. If there was such an understanding (much like the one common to contingent fee cases where the fee agreement limits attorney compensation to a portion of the plaintiff's recovery), we will have a DR 9–103(A)(2) "charging lien" case that perhaps readily can be characterized as simple negligence subject to liberal mitigation, in contrast with a case where an attorney negligently takes client funds from a trust account to which the attorney has a mere "retaining lien" conferring no greater right to the money than that of a general creditor. See *supra* note 4.

### A.

■ The Board did not determine whether Baldew and Haar had agreed that any attorney's fee would come, at least initially, from the settlement proceeds, or whether Haar instead was to "look[ ] to the personal responsibility of the client for payment of the fee." *Continental Cas. Co. v. Kelly*, 70 App. D.C. 320, 322, 106 F.2d 841, 843 (1939). Bar Counsel, however, in proceeding under DR 9–103(A)(2), necessarily premised his complaint on the belief that Haar had a charging lien, rather than a mere retaining lien, on the settlement proceeds in the trust account. We could, perhaps, merely proceed on that understanding without further inquiry, but in the interests of fairness to all concerned we believe it is important for the court to explore the record in search of that understanding. If the record permits but one finding, we can decide this threshold issue as a matter of law without a remand. *See In re Hopkins*, 677 A.2d 55, 62 (D.C.1996).

On February 21, 1989, Baldew wrote to inform Haar that she had "instructed Mr. Morris [of USIA] that payment for the amount of U.S. $20,000.00 which is due to me should be made to Mr. Auke Haagsma, who

---

6. The current version of Rule 1.15(c) makes clear that the lawyer shall not take his or her claimed share of a fund in which lawyer and client each claim an interest until there has been an "ac-

counting and severance of interests in the property," and that any portion of the fund "in dispute shall be kept separate by the lawyer until the dispute is resolved."

has been authorized to receive the funds on my behalf."[7] To the contrary, Robert Morris—the Chief of USIA's Foreign Service National Employment Office at the time of the incident, and the official with whom Haar negotiated the settlement—testified before the hearing committee that Baldew had asked for settlement checks to be sent directly to her, not to Haagsma. In considering the proper response to Baldew's request, both Haar and Morris began to suspect that Baldew did not intend to pay Haar his fee. As a result, negotiations commenced among Morris, Haar, Baldew, and Auke Haagsma, Baldew's representative in the United States. Morris, Haar, and Haagsma concurred in the settlement agreement, pursuant to which USIA issued two of the settlement checks totaling $16,133.16 jointly to Haar and Baldew. At a meeting on March 30, 1989 with Haar and Haagsma, Baldew had signed a power of attorney authorizing Haagsma, in his words, "to accept the settlement in her behalf" and to endorse the checks for deposit in Haar's trust account. Accordingly, Haagsma, as Baldew's attorney-in-fact, agreed to deposit the settlement checks in Haar's trust account pending resolution of the fee dispute.

It is clear from the record that Haar, Haagsma, and Morris all understood that the settlement proceeds would be used for Haar's fee, whatever it ultimately was determined to be. While Baldew's testimony is less clear, we believe that the only reasonable interpretation of this testimony would be that Baldew herself anticipated that the settlement funds would provide Haar's fee, as her authorized attorney-in-fact, Haagsma, had agreed.

More specifically, although Baldew's letter of February 21, 1989 indicates that she did not wish to pay Haar out of the settlement fund, and there was no written fee agreement to that effect, Baldew's answer to Haar's complaint in his later civil action for attorney's fees denied attempting to divert the settlement money entirely to Baldew herself.[8] Furthermore, at the disciplinary hearing, Baldew gave the following testimony in which she denied any desire for payment of settlement funds directly to her:

STEIN [Counsel For Haar]: Do you recall any conversations with Mr. Morris of USIA concerning this case?

BALDEW: I had many conversations on the case.

. . . . .

STEIN: [reading from answer to the complaint] By stating that Defendant instructed the organization mentioned to make direct payment of the total sum to her in Suriname?

BALDEW: That's a lie.

STEIN: That's a lie? Let me explore that a bit with you. . . . Is it a lie because you never called Mr. Morris and told him that you wanted payment directly? You never did that, did you?

BALDEW: I told him that I didn't trust Mr. Haar to get the payment. I wanted the payment in a trust account. The payment was not important to me.

. . . . .

STEIN: Do you recall a conversation in February of 1989 in which you said to Mr. Morris, I want you to pay me directly?

BALDEW: I don't recall that.

Keeping in mind the understanding and agreement of Baldew's attorney-in-fact, Haagsma, that Haar's fee would come from the settlement funds, and noting Baldew's apparent agreement that in February 1989 she intended the funds to go into a "trust account," we are satisfied that a reasonable

---

7. Baldew's dissatisfaction with the settlement and with Haar's fees appears to have begun with her discovery that USIA would not pay her attorneys' fees as part of the settlement.

8. Baldew's answer said where relevant:
 With regard to what is stated in point 9 of the complaint [the allegation that Baldew contacted USIA in an effort to have USIA pay Baldew directly] . . . Defendant [Baldew] is very disappointed in Plaintiff [Haar] who now claims that Defendant attempted to deprive Plaintiff of his legal fees by stating that Defendant instructed the organization mentioned to make direct payment of the total sum to her in Suriname. However if Plaintiff keeps persisting [in] the above statement[,] Defendant summons that Plaintiff will furnish proof or else the allegations made to be dropped.

fact-finder would have to find that Baldew personally agreed to use of the settlement funds for Haar's fee, despite what she had said on February 21, 1989, in her letter to Haar. This conclusion is reinforced by the fact that, in her answer to Haar's complaint for unpaid fee, Baldew stated that Surinamese nationals may not send more than $177 in United States currency out of the country each year. Accordingly, if Baldew intended to pay Haar a fee, it seems clear that she intended for the settlement funds to provide the necessary United States currency to match even her offer of $4,000.

We therefore conclude that all the participants looked to the settlement fund to provide Haar's fee, and thus that at least some of the money deposited in the escrow account was "presently or potentially" Haar's, i.e., subject to the charging lien permitted by DR 9–103(A)(2). In reaching this conclusion, however, without remanding for more conclusive fact-finding, we are aware that in the absence of a written fee agreement, or of an express charging lien, Haar's claim to the trust account funds was highly circumstantial; indeed, if Haar's charging lien had been contested by a Baldew creditor who had attached that escrowed money, Haar might have had a difficult time prevailing. All things considered, however, we, like Bar Counsel, are satisfied that Haar's charging lien was established sufficiently for this case to proceed under DR 9–103(A)(2).

### B.

Before considering particular mitigating and aggravating factors that bear on our selection of a sanction, it is important to understand as clearly as we can what Haar's state of mind was in taking the $4,000 from the account, for that surely has a bearing on sanction.

For this purpose we reiterate that the Board read DR 9–103(A)(2) as permitting a lawyer to withdraw funds "belonging to the lawyer" from a trust account unless the client has a "genuine dispute with the lawyer over the claimed amount," meaning the dispute must be "grounded in reality." *Haar I*, 667 A.2d at 1353. In the Board's view, if the lawyer had a legal right to the funds—and here the Board found that Haar's right to at least a $4,000 fee was undisputed—no client could effectively dispute the withdrawal within the meaning of the rule. We disagreed, concluding that a mere dispute in fact over the right of withdrawal would be enough to keep an attorney, namely Haar, from taking funds that he had every reason to believe were his. *See id.* at 1354. Thus, we indicated, the very fact of the dispute automatically deferred any definitive understanding of who was entitled to the property the attorney claimed from the account; the dispute, as such, served in the short run to negate any legitimacy to the lawyer's claim of right. The attorney's ultimately-proved right to that property might serve to mitigate a disciplinary violation for the attorney's withdrawal of disputed property, but, unless the client consented to the withdrawal, the attorney's legal right to the property could not protect against a DR 9–103(A)(2) violation.

In this case, presumably because of the Board's legal understanding of DR 9–103(A)(2), there is no clear Board finding as to whether respondent Haar, in withdrawing the $4,000, mistakenly believed in good faith that he had Baldew's consent to that withdrawal (a negligent mistake of fact); the Board focussed entirely on Haar's good faith belief in his legal right to the $4,000 without regard to Baldew's consent to the withdrawal.[9]

Respondent was fully aware of the dispute raised by Ms. Baldew. *If he read her correspondence as permitting him to withdraw $4,000 and to contest the balance due him in the future, he was utterly wrong.* This committee does not agree that any reasonable reading of Ms. Baldew's letters could produce that conclusion.
(Emphasis added.)

9. According to the Hearing Committee (majority) report and recommendation:
 It is abundantly clear that Ms. Baldew was willing to give Respondent $4,000 only as full and complete satisfaction of his $12,921.75 invoice for legal fees. At no time did she authorize Respondent to withdraw $4,000 from the fund intending that the dispute about the balance due Respondent would be resolved later.

While no one disputes that Haar believed he was legally entitled to the $4,000, it is clear from *Haar I* that we were not satisfied Haar had a sound basis in fact for believing Baldew had agreed to at least a $4,000 fee *and* had consented to his withdrawal of that amount from the trust account. *See Haar I,* 667 A.2d at 1353–54. Although the Board expressly found that Haar had acted in good faith, and there is a record basis for believing so, we already have made clear—as the hearing committee did earlier, see *supra* note 9— that any belief Haar may have had in Baldew's willingness to permit the withdrawal at the time he took the $4,000 was negligently mistaken. *See id.* Because of Haar's good faith, though negligent, mistake of law—his perceived absolute right to the $4,000—the question whether Baldew had consented to the withdrawal may have seemed beside the point to Haar, and thus he may not have mentally addressed the importance of that factual issue. As we said in *Haar I,* 667 A.2d at 1354 (quoted above in Part I.), Haar negligently avoided coming to grips with that question.[10]

It is important, moreover, before considering possible mitigation, to understand exactly what good faith, negligent mistake of law Haar made. Indeed, there is no evidence Haar ever focussed on the meaning of that rule. Nor did he happen, fortuitously, to have operated with the same legal understanding the Board held; i.e., he never took the position he was entitled to trust account money about which there was no "genuine" dispute. Instead, it is clear from Haar's correspondence and testimony that he be-

lieved there was *no* dispute—not even a frivolous dispute—regarding his right to the $4,000 at the time he made the withdrawal. Indeed, Haar testified that he had refused Baldew's subsequent demand to replace the $4,000 because Baldew explicitly had settled with him for at least that amount and was trying, retroactively, to negate her previous authorization.[11] In a May 17, 1989 letter to Baldew informing her of his withdrawal of the $4,000, as well as in his testimony before the hearing committee, Haar insisted that Baldew's earlier offer to settle for $4,000 was an acknowledgment by Baldew that Haar had earned at least that much. Haar also claimed that at the March 30 meeting among Haar, Baldew, and Haagsma, Baldew had authorized payment of the $4,000 as partial payment of the undisputed amount owed.

The hearing committee explicitly rejected Haar's assertion that on March 30 Baldew had authorized payment of $4,000 as partial payment of his fee. See *supra* note 9. With that contention extinguished, Haar is left—as a basis for his actions—only with his legal understanding that Baldew's earlier offer to settle effectively acknowledged that Haar was entitled to at least the $4,000 from the account. Haar's real mistake of law, therefore, appears to have been his misunderstanding of the law of accord and satisfaction. As both the hearing committee, see *supra* note 9, and this court in *Haar I,* 667 A.2d at 1354–55, recognized, Haar's legal interpretation of Baldew's settlement offer was entirely at odds with the meaning of an offer to settle the entire case for $4,000. Accordingly, Haar's good faith, negligent mistake of law

10. This mistake-of-fact analysis drawn from *Haar I* gives Haar the benefit of the doubt. Haar appeared to believe Baldew had agreed he was entitled to $4,000 but had not consented to his withdrawal of that amount from the account. Haar testified before the hearing committee: "I want to be clear. [Baldew's letter of February 21, 1989] says that I am entitled to $4,000. *It doesn't say whether I am entitled to withdraw it at this time.*" (Emphasis added.)

11. Haar testified before the hearing committee as follows:

As in any type of settlement whether it be a personal injury or commercial case: if there is a settlement, there's a settlement. It's difficult to come back weeks, months, years latter and

say well, that's not what I meant, please put the money back.

I did not put the money back because I believed we had come to a full and fair amicable agreement on March 30th that was confirmed in my letter of May 17 to which I received no response until this late date in July....

A suit was filed inclusive of that $4,000 and in the complaint it discussed what led up to it, the February 21 letter, the March 30 meeting and the agreement. Seeing as Ms. Baldew and I could not agree, I sought a court to make a final determination as to whether I was entitled to take it out from the beginning or was required to deposit it back in the account at the end.

was a mistake that careful analysis of a known legal doctrine would have revealed. *See Pierola v. Moschonas,* 687 A.2d 942, 947 (D.C.1997) (reviewing history and principles of accord and satisfaction).

In sum, whereas the Board perceived no "genuine" dispute over the $4,000—and thus no violation of DR 9–103(A)(2)—because Baldew could not effectively contest Haar's legal right to a fee of at least that much, Haar mistakenly perceived no dispute whatsoever over his right to the $4,000 because he mistakenly understood the law to accord him at least that much since it had been offered in settlement. We therefore have here a special form of misappropriation case based on a lawyer's good faith, negligent mistake of established law and on his good faith, negligent failure to address a controlling question of fact.

### C.

Although we have not had a negligent misappropriation case in which we have imposed less than a six-month suspension, we noted earlier that we never have said a suspension of some kind would be the floor in such cases, and that we specifically told the Board in *Haar I* that it was not necessarily required to recommend a six-month suspension here. We therefore must consider the usual mitigating and aggravating factors to determine the discipline appropriate for this case, guided by prior negligent misappropriation cases, *see Evans,* 578 A.2d at 1150–51; *see also In re Reback,* 513 A.2d 226, 231 (D.C. 1986), but keeping in mind that this is a special form of negligent misappropriation case: a claim of right based on a DR 9–103(A)(2) charging lien.

In recommending an informal admonition, the Board considered the following factors: (1) This is a case of first impression. *See In re Confidential (J.E.S.),* 670 A.2d 1343, 1346 (D.C.1996) (imposing informal admonition for case of first impression where other mitigating factors were strong). (2) The question whether a violation had taken place was "close." *See Haar I,* 667 A.2d at 1351.(3) Haar had no record of prior discipline. *See Reback,* 513 A.2d at 231.(4) Haar had a lengthy record of service to the Bar and of substantial pro bono service to the community, making him a "valuable member of our Bar and the community," a context in which this single violation should be evaluated. *See In re Hutchinson,* 534 A.2d 919, 924 (D.C. 1987) (en banc). (5) Haar cooperated fully with Bar Counsel. *See Reback,* 513 A.2d at 233.(6) Haar did not attempt to conceal his conduct from his client; according to the Board, "he informed her of what he proposed to do before withdrawing the $4,000." *See Evans,* 578 A.2d at 1151.(7) Haar ultimately vindicated his right to the $4,000 by obtaining a larger fee award. *See Haar I,* 667 A.2d at 1355 n. 5. (8) Finally, Haar had obtained a favorable settlement for his client. The Board accordingly concluded that a sanction greater than an informal admonition would have a purely punitive effect, rather than serving the public interest as a deterrent to future misconduct. *See In re Ryan,* 670 A.2d 375, 380 (D.C.1996).

Bar Counsel objects to the Board's use of a number of these mitigating factors. Specifically, Bar Counsel notes that, while Haar did cooperate with the investigation, he did nothing so extraordinary as to merit mitigation, particularly because all attorneys are required to cooperate with Bar Counsel. *See* DR 1–101(A)(5) (now District of Columbia Rule of Professional Conduct 8.4(d)). Bar Counsel also challenges the Board's findings that Haar did not act in a deceitful manner. Finally, Bar Counsel questions the relevance of Haar's lack of disciplinary record and his achievement of a favorable result for the client.

■ We agree with Bar Counsel that Haar's success for his client has no bearing on the severity of the discipline to be imposed. The Board has cited no authority for the use of success or failure as a mitigating or aggravating circumstance, and we think it entirely inappropriate in a case involving fiduciary responsibilities. *Cf. In re Chisholm,* 679 A.2d 495, 505 (D.C.1996) (finding success of attorney in separate proceeding irrelevant in disciplinary action for neglect of client matters). Bar Counsel's other contentions, however, are not persuasive.

Bar Counsel vigorously argues that Haar's actions were dishonest and deceitful because, rather than returning the $4,000 to the trust account when Baldew asked him to do so—and as DR 9–103(A)(2) plainly required—Haar kept the money and placed the matter before a court in the United States, obtaining a default judgment for a much higher amount, with reason to believe Baldew probably could not afford to contest Haar in this country. Bar Counsel calls this an aggravating factor.

The Board, citing *Evans*, sees the matter differently, emphasizing Haar's lack of dishonest behavior given his subjective belief in a particular right to act. *Evans*, 578 A.2d at 1143 ("absence of dishonesty"). Relying on the hearing committee, the Board found that Haar had acted in good faith, and not dishonestly, in that he genuinely believed he was entitled to withdraw $4,000 and did not in any way deceive Baldew as to his intentions. While we do not disagree with these Board findings (although they do not distinguish between mistake of fact and mistake of law, see *supra* Part III.B.), we must agree with Bar Counsel that Haar's good faith is tarnished by his refusal to replace the $4,000 when Baldew requested him to do so; the clear language of DR 9–103(A)(2) disentitled him to any "portion" of the fund that was "disputed by the client."

On the other hand, we reject Bar Counsel's suggestion that Haar was dishonest because of correspondence that was a "self-serving" attempt to create a "deceptive paper trail." As we indicated, the Board made no finding that Haar had acted dishonestly or that Haar in any way had attempted to deceive his client. While the hearing committee on which the Board relied did find that any belief Haar may have had that Baldew authorized the $4,000 withdrawal was "utterly wrong," see *supra* note 9, that is far removed from a finding of dishonesty and deception. See *Evans*, 578 A.2d at 1151.

Nor can we agree with Bar Counsel's objection to the Board's consideration of Haar's lack of prior discipline. Bar Counsel argues that, "[a]lthough absence of prior discipline may be a mitigating factor … the Court historically has not viewed a 'clean' disciplinary record as a mitigating factor in disciplinary proceedings involving mishandling of client funds," citing *Addams, Robinson,* and *In re Buckley,* 535 A.2d 863 (D.C.1987). The three cases cited, however, were intentional misappropriation cases, and we see no reason why Haar's lack of prior discipline should not be accepted as one of many available mitigating factors in this negligent misappropriation case, as in other such cases. See *Evans,* 578 A.2d at 1151.

■ Finally, we cannot agree with Bar Counsel's contention that, because attorneys are required to cooperate with Bar Counsel, the Board improperly considered Haar's cooperation in this case. We have stated before that cooperation with Bar Counsel is a mitigating factor in ascertaining proper discipline. See *Reback,* 513 A.2d at 233. Contrary to Bar Counsel's assertion, the Board did not say that Haar's cooperation was "so extraordinary as to merit the least severe sanction"; rather, the Board considered Haar's cooperation merely as one of the many mitigating factors it considered.

### D.

■ We turn, then, to the specific sanction required. "A recommendation of the Board on Professional Responsibility with respect to a proposed sanction comes to us with a strong presumption in favor of its imposition." *In re Goffe,* 641 A.2d 458, 463 (D.C.1994) (per curiam). This is as true in a case where the Board recommends the lightest sanction as it is when the Board recommends disbarment. "While the ultimate choice of a sanction rests with this court, our rule requires us to respect the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable." *Ryan,* 670 A.2d at 380 (citation and internal quotation marks omitted). "Ultimately, however, the system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court." *Goffe,* 641 A.2d at 464.

As our evaluation of the mitigating factors indicates, we believe the balance lies somewhere between the Board's and Bar Counsel's analyses. Conceptually, this is a special

form of negligent misappropriation case, and we readily agree with the Board that, on all the facts, the sanction warranted here is less than the six-month suspension routinely imposed in the other negligent misappropriation cases we have seen.

There are several powerful mitigating factors here. *First,* Haar believed in good faith, although negligently, that he had an undisputed right to withdraw the $4,000 from the trust account at the time he did so, given Baldew's willingness to pay that amount to settle the case (compared to the $12,921.75 Haar had claimed for his fee).[12] *Second,* but for Baldew's entirely meritless dispute of that withdrawal, Haar would have been entitled to take the $4,000 at the time he did so, since it is "now undisputed" that he had been entitled at least to that amount. *Haar I,* 667 A.2d at 1355 n. 5. *Third,* this court, in rejecting the Board's legal interpretation, acknowledged in *Haar I* that the question whether there had been a DR 9–103(A)(2) violation was "close." *Finally,* Haar's prior exemplary professional record, including pro bono activities, coupled with his cooperation in this case, reflects a lawyer who is fundamentally an honorable member of our bar.

If Haar had returned the $4,000 to the fund when Baldew asked him to do so, there would be a much more substantial good faith/genuine belief underpinning to the negligent withdrawal charge; that would have been another very powerful mitigating factor. But Haar refused to replace the $4,000 when asked to do so and thus took a second negligent step reinforcing his violation of DR 9–103(A)(2).

In this special kind of negligent misappropriation case we must conclude, under all the circumstances, that a suspension, not merely a censure or admonition, is warranted, given that we have imposed suspensions for even the most unwitting misappropriations. *See, e.g., In re Choroszej,* 624 A.2d 434, 435–36 (D.C.1992) (imposing six-month suspension under DR 9–103(A) for negligent misappropriation and under DR 9–103(B)(3) for inade-

quate record keeping, when respondent attorney paid his rent and other bills from a trust account he genuinely, but mistakenly, believed retained only his fee). We believe Haar's suspension should be for thirty days. Given the important purpose of retaining client confidence in the inviolability of funds entrusted to lawyers, we are not willing to say that a lawyer's good faith, disputed use of funds in a lawyer-client trust account, even if done only negligently, can result in less than some kind of suspension from the practice of law.

We stress, moreover, that the thirty-day suspension imposed as a sanction in this case will not necessarily serve as the appropriate suspension for this kind of violation in future cases, since not all the mitigating factors will be available after this case of first impression. *See Hessler,* 549 A.2d at 703 (emphasizing law on commingling "to alert the Bar that in future cases of even 'simple commingling,' a sanction greater than public censure may well be imposed"); *In re Hines,* 482 A.2d 378, 386–87 (D.C.1984) (per curiam) (adopting recommendation of sanction less than disbarment for misappropriation but "notifying" bar that "disbarment will be the norm" for misappropriation of client funds except in cases of simple negligence).

 In reflecting on this case, it is important to keep clearly in mind the distinction between a right to payment and a right to particular property. When a lawyer performs legal work for another, the client of course has an obligation to pay the lawyer's fee. But absent agreement or a statutory lien, the lawyer has no right to any particular property of the debtor-client, including the proceeds of litigation. The lawyer as an unsecured creditor has no intrinsic right of self-help, and even where a specific property interest—a charging lien—is created, the right to self-help is strictly limited by law and, in the lawyer's case, by the rules of professional conduct.

---

12. Haar's reliance on Baldew's failure to answer the letter in which Haar told her he was going to take the $4,000 is undermined to some extent by the fact that "there is nothing in the record

showing that [Haar] knew Ms. Baldew had received his correspondence when he withdrew the funds." *Haar I,* 667 A.2d at 1353 n. 4.

■ The underlying purpose of 9–103(A)(2) and its successor, Rule 1.15(c), is straightforward. It is to make it possible for a client to entrust property to the safekeeping of a lawyer with confidence that the funds will be as safe as they would be if the client herself were to continue to hold them. This fundamental principle underlies the requirement that such funds be kept entirely separate from the lawyer's own funds. *See* DR 9–102(A); Rule 1.15(c). This same principle also accounts for the severity with which this court has imposed sanctions upon attorneys who take client funds for their own use, *see Addams,* 579 A.2d at 191, even if unwittingly and negligently, *see Evans,* 578 A.2d at 1151. And, this very principle inheres in the DR 9–103(A)(2) requirement that, even if the funds eventually can be proved to belong to the lawyer, the client can know in the meantime, despite the lawyer's strong claim, that as long as she disputes the lawyer's right to those funds the lawyer cannot take them for the lawyer's own use until the dispute is finally resolved. Only by such limitations can the sanctity of client funds in a lawyer's possession be preserved and the confidence that clients repose in their lawyers as faithful fiduciaries be assured and maintained.

\* \* \* \* \* \*

Accordingly, we order respondent Paul S. Haar suspended from the practice of law for a period of thirty days, effective thirty days from the date of this order. *See* D.C. Bar R. XI § 14(f).[13]

*So ordered.*

**13.** The dissent takes the position that, because the Board recognized Haar made a good faith, reasonable mistake of law, he should not receive discipline greater than an informal admonition. The dissent implicitly is premised on Haar's mistake in interpreting DR 9–103(A)(2), a mistake he did not make. But even if Haar's mistake of law could be related to DR 9–103(A)(2), we do not believe that a sanction less than a 30–day suspension can be justified. We recognize there is tension between the language of *Haar I* that DR 9–103(A)(2) is "unambiguous," 667 A.2d at 1353, and the court's conclusion that the question "whether there was a dispute concerning respondent's entitlement to the amount withdrawn is a close one," *id.* at 1351. But neither the dissent nor Haar suggests there was no serious question of interpretation here that should make a lawyer pause. Nor do we believe there is any sound

RUIZ, Associate Judge, dissenting:

I respectfully dissent from the imposition of a thirty-day suspension in this case. Instead, I would adopt the recommendation of the Board on Professional Responsibility, to issue an informal admonition, as we are supposed to do except only in those cases where accepting the recommended disposition "would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g)(1); *In re Confidential,* 670 A.2d 1343, 1346 (D.C.1996). We are to respect the Board's sense of equity, "unless that exercise of judgment proves to be unreasonable." *In re Ryan,* 670 A.2d 375, 380 (D.C.1996) (quoting *In re Smith,* 403 A.2d 296, 303 (D.C. 1979)). The majority does not make the case that the Board's recommended disposition is "unreasonable." For the reasons stated below, I believe that the majority's analysis does not support a conclusion that informal admonition would be inconsistent with sanctions for comparable conduct. Moreover, it is not the informal admonition but the thirty-day suspension that would be unwarranted, because it is unfairly harsh to respondent and is unnecessary to deter future violations and enhance public confidence in the Bar.

The majority's recommended thirty-day suspension is a mitigated sanction which uses as its starting point the six-month suspensions that we have imposed for negligent misappropriation. According to the majority, negligent misappropriation is the correct

reason why a mistake of law, even concerning a rule not yet definitively interpreted, should generate less culpability than a mistake of fact when the District of Columbia Bar's Legal Ethics Committee is available to give opinions on difficult ethical issues, as a protective measure. There is no evidence that Haar sought the Committee's advice. Even if, as the dissent argues, Haar would not have been negligent in interpreting DR 9–103(A)(2) as the Board interpreted it, he would have been negligent in failing to seek available expert advice as evidence of due care when thinking of adding an interpretive gloss ("genuine" dispute) in derogation of the rule's plain language. Finally, the dissent does not question that, at bottom, a misappropriation occurred here. As elaborated above, we believe that for all misappropriations at least some level of suspension is required.

theoretical framework to be applied here because the circumstances of this case present "a special form of misappropriation case based on a lawyer's good faith, negligent mistake of established law and on his good faith, negligent failure to address a controlling question of fact." *See ante* at 421.[1] According to the majority, Haar was negligent because he 1) mistakenly believed that he could withdraw from the client's trust account fees to which he was legally entitled,[2] and 2) failed to ascertain whether as a matter of fact the client disputed his entitlement to the withdrawn amount, regardless of the reasonableness of · the dispute. The majority also points to Haar's refusal to replace the $4000 he withdrew from the trust account once the client asked him to do so.

I agree with the majority's reasoning that DR 9–103(A)(2) provides a special case within the strict rule against misappropriation of client funds contained in DR 9–103(A). Therefore, where there has been a negligent violation of DR 9–103(A)(2), cases sanctioning negligent misappropriation under DR 9–103(A) may be considered comparable for purposes of determining the appropriate sanction. I subscribe to that analysis for future cases involving violations of DR 9–103(A)(2). In the case of Haar, however, where we *for the first time* established what constitutes a violation of DR 9–103(A)(2),[3] it cannot be said that Haar's actions constituted negligence. The majority treats the fact that *Haar I* presented a case of first impression as a "mitigating factor." The effect of our ruling in *Haar I* is more fundamental than that, however, because it eliminates the basis for the majority's conclusion that Haar acted negligently, thereby meriting suspension.

There is no dispute that Haar acted in good faith, consistently with a reasonable interpretation of DR 9–103(A)(2) held by the Board on Professional Responsibility until this court stated otherwise in *Haar I.* Nonetheless, the majority concludes that Haar acted pursuant to "a good faith, negligent mistake of law." I do not see any negligence in Haar's conduct. Not every mistake of law is necessarily negligent. For negligence to exist there must be a determination that holding the mistaken belief violates a standard of reasonable care. *See Sinai v. Polinger Co.,* 498 A.2d 520, 529 (D.C.1985); RESTATEMENT (SECOND) OF TORTS, § 282 (1965) ("[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm."). We know that the Board interpreted DR 9–103(A)(2) as permitting Haar's conduct; there is no information about how other practitioners interpreted the Rule. Therefore, unless the majority believes that the Board also was *negligent,* not just mistaken, in arriving at an interpretation of the Rule that would have permitted Haar's conduct, there is no basis in this record from which to conclude that Haar's actions violated an established standard of care. Are a lawyer's actions in the course of his or her practice to be held, as a matter of law, to the standard of what this court decides the Rules require after briefing and argument by the parties and conference among the judges? I would not think so. If it is not negligence for Haar to have believed he could withdraw the $4000 to which he correctly thought he was entitled—his asserted mistake of law—it also cannot be negligence to fail to take an action (verify his client's consent) that Haar's good faith belief did not require—his asserted mistake of fact. Therefore, Haar's supposed "failure" to ascertain whether as a matter of fact his client disagreed—reasonably or not—with his withdrawal of $4000 from the trust account or to replace that amount once

---

1. The majority's rationale differs from those of the Board and Bar Counsel. The Board considers that Haar's actions are not analogous to misappropriation or commingling and were not dishonest. In *In re Haar,* 667 A.2d 1350 (D.C. 1995) (*Haar I*), Bar Counsel originally argued, in support of a six-month suspension, that Haar's misconduct was "akin to the intentional misappropriation of client funds." In this second phase of the case, Bar Counsel now recommends a 90–day suspension because Haar's actions although "not constitut[ing] a classic misappropriation of client funds," is nonetheless "a serious ethical violation ... more egregious than 'simple commingling.'"

2. The majority concludes, and I agree, that Haar had a charging lien on the client's trust account. *See ante* at 420.

3. *Haar I, supra* note 1, 667 A.2d at 1353.

his client requested him to do so, also cannot be characterized as negligent.[4]

It is important to focus on what constitutes "negligent misappropriation." The majority, citing from *In re Evans*, appears to define "negligent misappropriation" as a situation where the attorney has "an honest but mistaken belief" that he or she may withdraw funds. 578 A.2d 1141, 1142 (D.C.1990) (per curiam). Under traditional concepts of negligence, an honest but mistaken belief does not constitute negligence, however, without a further showing that it was unreasonable to hold that belief. The language used by this court in negligent misappropriation cases suggests that traditional concepts of negligence apply to bar discipline cases. We have said that "[i]mproper intent is not an essential element of misappropriation," and that, in cases where there has been commingling, "misappropriation ... is essentially a *per se* offense." *See, e.g., In re Pels*, 653 A.2d 388, 394 (D.C.1995) (citations omitted). Those statements appear to mean that neither wrongful intent nor, indeed, intent of any kind, is required in order to establish a "negligent" violation of the Rule's strict injunction against misappropriation. That is not to say, however, that everyone who acts with "an honest but mistaken belief" will always be negligent.[5] A *per se* rule of negligence is not the same as a rule of strict liability. A *per se* rule establishes that violation of a known standard will be conclusive proof of negligence as a matter of law. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 36, at 229–30 (5th ed.1984). Strict liability, on the other hand, means that conduct, usually involving very dangerous activities, is actionable regardless of the standard used to evaluate the actor's conduct. *Id.* § 75 at 534–38. If conduct pursuant to "an honest but mistaken" belief is sufficient, without more, to make an attorney's conduct actionable in the discipline system, we will have established a rule of strict liability that departs from our former negligent misappropriation cases.[6]

There can be no doubt that in defining misappropriation, we have strictly construed a lawyer's duty to handle client funds only as authorized. *Haar I* continues to impose that strict construction in its interpretation of DR 9–103(A)(2). When it comes to sanction for misappropriation—the sole focus of this case—we have been similarly strict. We have not, however, previously gone as far as declaring a rule of strict liability regardless of the circumstances surrounding the misappropriation. Indeed, we have recognized levels of culpability leading to different sanctions. Intentional misappropriation · merits disbarment. *In re Addams*, 579 A.2d 190, 191 (D.C.1990) (en banc). Where misappropriation results from simple negligence, however, a six-month suspension has been the norm. *See In re Ray*, 675 A.2d 1381, 1388 (D.C.1996); *In re Choroszej*, 624 A.2d 434, 436 (D.C.1992) (per curiam). I submit that

4. Responding to this dissent, the majority states that because Haar did not rely on a particular interpretation of DR 9–103(A)(2), Haar's mistake of law pertained to the law of accord and satisfaction, specifically, Haar's understanding that because the client offered to settle for $4000, Haar was entitled to withdraw at least $4000. *Ante* at 421–22. Haar's flawed understanding of the law of accord and satisfaction is not at issue here, however, as it cannot form the basis for the sanction being imposed in this discipline case for negligent misappropriation under DR 9–103(A)(2). It is against that rule that Haar's conduct must be evaluated for negligence. The majority also states that there is "no sound reason why a mistake of law ... should generate less culpability than a mistake of fact...." *Ante* at 425 n. 13. I agree. However, where a Rule's requirement is uncertain, an attorney should not be culpable because he failed to ascertain facts

that would have been required only if the legal standard had been clear.

5. The majority apparently agrees with this view, because it argues that by failing to seek the advice of the District of Columbia Bar's Legal Ethics Committee, Haar somehow was negligent. There is no basis in the record from which to infer, however, that the Legal Ethics Committee would have arrived at an interpretation different from that held by the Board.

6. Although it does not employ the term "strict liability," Bar Counsel's brief quotes from the official comment to the Model Code of Professional Responsibility that "the attorney accepts the client's funds in trust and remains strictly accountable for his or her own conduct in administering that trust." ANNOT. MODEL CODE OF PROFESSIONAL RESPONSIBILITY 441–42 (1979 ed.). *But cf.* note 1, *supra.*

this case does not meet the requirements for "simple negligence."

The cases where the court has found "negligent" misappropriation were different from the present case in a significant respect: in those cases, respondent's obligation was clear, yet respondent unintentionally or inadvertently failed to satisfy that duty.[7] Thus, misappropriation is deemed a *per se* offense because an attorney is held to answer for "any unauthorized use of client's funds entrusted to" an attorney. *In re Harrison, supra* note 7, 461 A.2d at 1036 (citation omitted). "Unauthorized use" in this context where there is no dispute that Haar was entitled to the funds can only mean lacking in legal authority under the Rules of Professional Responsibility. That is where this case is different; whether Haar's withdrawal of $4000 was authorized under DR 9-103(A)(2) was a legal issue of first impression presented by this case. In *Haar I* we stated that, for purposes of DR 9-103(A)(2), a lawyer lacks authority so long as the client actually disputes the attorney's entitlement to funds, without regard to the fact that the client may be wrong or acting unreasonably. This definition of what constitutes an "unauthorized" withdrawal in the context of DR 9-103(A)(2), amounting to misappropriation, however, was not known before *Haar I.*[8] I submit that the cases where the court previously has found negligent misappropriation are different in kind from the case before us because here the respondent not only did not

act unintentionally or inadvertently in violation of the Rules, but acted consistently with a reasonable understanding of what the Rules permitted.

In my view, given Haar's good faith actions consistent with a reasonable interpretation of DR 9-103(A)(2), all that can be said is that Haar acted in a way that violated the Rule, *as subsequently determined* in the course of *Haar I.* Haar's actions, as later established in *Haar I,* constituted misappropriation; but he was not negligent in acting as he did, when he did because his actions did not breach an established standard. Cases involving negligent misappropriation are not comparable to this case, and there is no reason, therefore, to begin to consider the appropriate sanction from the six-month suspension benchmark established in cases involving instances of truly negligent misappropriation.

Moreover, any suspension is unwarranted in this case. Our discipline system is not punitive, but intended for the protection of clients, the profession and the public. *In re Ryan, supra,* 670 A.2d at 380. There is a very real difference in impact and perception between the informal admonition recommended by the Board and a suspension, even the one-month suspension imposed by the majority. The harshness of suspending Haar under these circumstances is not outweighed by any credible interest. Any interest that Haar's client may have claimed in

---

7. Moreover, the attorneys in those cases where we have found negligent misappropriation had engaged in conduct that did not safeguard the attorney's known obligations under the Rules of Professional Conduct. *See In re Reed,* 679 A.2d 506, 509 (D.C.1996) (per curiam) (respondent's "accounting practices were practically non-existent and careless at best"); *In re Pels, supra,* 653 A.2d at 393-94 (commingling, failure to keep records, account for client funds and deliver client or third party funds); *In re Powell,* 646 A.2d 340, 343 (D.C.1994) (respondent's conduct was determined to be "perilously close to gross negligence"); *In re Choroszej, supra,* 624 A.2d at 437 (respondent was "insensitive to his fiduciary responsibilities" and engaged in "sloppy bookkeeping"); *In re Cooper,* 613 A.2d 938, 939 (D.C. 1992) (per curiam) (respondent's "failure to understand the true state of his authority in [a] family dealing involved simple negligence or its equivalent"); *In re Evans, supra,* 578 A.2d at 1150 (respondent, who knew that he had to ob-

tain his client's consent, failed to effect a valid side agreement permitting him to take fee from estate funds); *In re Hessler,* 549 A.2d 700, 708 (D.C.1988) (commingling); *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983) (misappropriation not intentional, but rather "the result of [respondent's] failure to keep proper records").

8. In *Haar I,* the court stated that the Rule is "unambiguous," *supra* note 1, 667 A.2d at 1353, but that "whether there was a dispute concerning [Haar's] entitlement to the amount withdrawn is a close one." *Id.* at 1351. As mentioned above, although the court may have determined that the dictionary meaning of the word "dispute" was plain and meant a dispute in fact, even the Board did not so interpret the Rule. Therefore, for purposes of evaluating Haar's conduct in determining the appropriate sanction, it is fair to say that both the legal and factual issues were "close."

the disputed fee has been shown to have had no legal basis; in fact, the client owed much more than the disputed $4000 that Haar withdrew. Nor is there a larger public interest at stake. Once we have clarified the requirements of a Rule, as we did in *Haar I*, attorneys are well on notice of their obligations and must conform their conduct accordingly, on pain of sanction. Although we certainly wish to heighten lawyers' sense of obligation to their clients in their judgments about what the Rules of Professional Conduct require, particularly when it comes to the subject of client funds, basic notions of fairness and notice should caution the court against suspending attorneys based on new, and, as in this case, perhaps unanticipated, legal interpretations. *See In re Thorup*, 432 A.2d 1221, 1225 (D.C.1981). As a result, I believe that the Board's recommended informal admonition is the appropriate remedy in this case.