**In Re: CONDEMNATION OF SPRING-BORO AREA WATER AUTHORITY OF PROPERTY OF Patricia E. GILLETTE, Mary E. Burnham, Brian E. Gillette, Jason M. Gillette, Jeremy M.O. Burnham, Robert J.S. Burnham, Chad Kunz, John O.S. Burnham and Ruth E. Burnham, husband and wife**

**Appeal of: Patricia E. Gillette, Mary E. Burnham, Brian E. Gillette, Jason M. Gillette, Jeremy M.O. Burnham, Robert J.S. Burnham, Chad Kunz, John O.S. Burnham and Ruth E. Burnham.**

Commonwealth Court of Pennsylvania.

Argued Oct. 17, 2005.
Decided Feb. 2, 2006.
Reargument Denied March 29, 2006.
Publication Ordered April 26, 2006.

Daniel A. Durst, Meadville, for appellants.

David L. Hotchkiss, Meadville, for appellee.

BEFORE: FRIEDMAN, Judge, COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge FRIEDMAN.

Patricia E. Gillette, Mary E. Burnham, Brian E. Gillette, Jason M. Gillette, Jeremy M.O. Burnham, Robert J.S. Burnham, Chad Kunz, John O.S. Burnham and Ruth E. Burnham (collectively, Condemnees) appeal from the May 2, 2005, order of the Court of Common Pleas of Crawford County (trial court) overruling Condemnees' preliminary objections to Springboro Area Water Authority's (the Authority) exercise of eminent domain over lands located within an Agricultural Security Area. We reverse.

In August 1989, Spring Township established an Agricultural Security Area (ASA) pursuant to the Agricultural Area Security Law (Act).[1] (R.R. at 82.) The designated ASA includes Condemnees' properties. (Joint Stipulation, R.R. at 97–98.)

The Authority is a municipal authority organized pursuant to the Municipality Au-

---

1. Act of June 30, 1981, P.L. 128, *as amended,* 3 P.S. §§ 901–915.

thorities Act of 1945,[2] and its purpose is to supply water to the residents of Spring Township and the Borough of Springboro. (R.R. at 106.) On December 22, 2004, the Authority filed a Declaration of Taking seeking to condemn portions of Condemnees' properties in order to place a water line to benefit the Conneaut School District. The taking would include a permanent easement and right of way twenty feet wide, with a temporary thirty-foot construction easement. (R.R. at 3–4.)

Subsequently, Condemnees filed preliminary objections with the trial court, contending that the Authority violated section 13(b) of the Act, 3 P.S. § 913(b), by condemning ASA land without seeking prior approval from the Agricultural Lands Condemnation Approval Board (Board) and various local governing bodies. (R.R. at 3–5, 25–26; Trial ct. op. at 1–2.) At a hearing before the trial court, the Authority argued that it did not violate the Act because its condemnation of the ASA property fell within the Act's exemption from the pre-approval requirements. *See* 3 P.S. § 913(b). The parties jointly stipulated that the sole issue before the trial court was whether the Authority was required to comply with the pre-approval requirements of section 13(b) of the Act. (Joint Stipulation, R.R. at 98.)

■ After an evidentiary hearing, the trial court overruled Condemnees' preliminary objections, holding that the Authority was exempt from the Act's pre-approval requirements because the Authority operated an underground utility facility. (Trial ct. op. at 2–3.) Condemnees now appeal this decision.[3]

Condemnees argue that the trial court erred by exempting the Authority from complying with the pre-approval requirements set forth in section 13(b) of the Act. Section 13(b) of the Act provides in relevant part:

(b) Approval required for condemnation by a political subdivision, authority, public utility or other body.—*No* political subdivision, *authority, public utility* or other body having or exercising powers of eminent domain *shall condemn any land within any [ASA] for any purpose, unless prior approval has been obtained* from [four different governing bodies.] . . . . The *condemnation approvals* specified by this subsection *shall not be required* for an *underground public utility facility* or for any facility of an electric cooperative corporation *or for any public utility facility* the *necessity for and the propriety and environmental effects of which has been* reviewed and ratified or *approved by the* Pennsylvania Public Utility Commission [*PUC*] or the Federal Energy Regulatory Commission [*FERC*] regardless of whether the right to establish and maintain such underground or other public utility facility is obtained by condemnation, or by agreement with the owner.

3 P.S. § 913(b) (emphasis added). The Act clearly relieves "underground public utility facilities" and public utilities whose necessity and environmental effects have been reviewed and that have received PUC or FERC approval from obtaining condemnation approval. However, because the Act does not define the term "underground public utility facility" or "public utility," we must interpret the stat-

---

2. Act of May 2, 1945, P.L. 382, *formerly* 53 P.S. §§ 301–322, repealed by the Act of June 19, 2001, P.L. 287. A similar act is now found at 53 Pa.C.S. §§ 5601–5623.

3. When an appeal presents a question of law, such as statutory interpretation, our scope of review is plenary. *In re Realen Valley Forge Greenes Associates,* 576 Pa. 115, 838 A.2d 718 (2003).

ute to ascertain whether the General Assembly intended the exemption to apply to the Authority.

▮ Condemnees' assert that this exemption only applies to *regulated* "underground *public utility* facilities," not to the Authority, which provides unregulated public utility services.[4] Applying the rules of statutory interpretation,[5] we agree with Condemnees that limiting the "underground public utility facility" exemption to those facilities operated by *regulated* public utilities is consistent with the rules of statutory construction and best effectuates the intent of the General Assembly by subjecting all proposed condemnations of ASA land to some form of agency review.

Section 13(b), and the Act as a whole, reflects the General Assembly's clear intent to protect designated ASA lands from urban encroachment and uses inconsistent with agriculture, and to encourage the continued agricultural use of Commonwealth lands.[6] In view of the Act's purpose, it is reasonable to conclude that the General Assembly intended all condemnations of ASA land to be subject to regulatory review *prior* to condemnation, ensuring that due consideration is given to the impact that condemnations have on the agricultural use of the land. To this end, the Act sets forth requirements with which *all entities* with the power of eminent domain must comply before condemnation of ASA land can occur. 3 P.S. § 913. By exempting only *regulated* underground public utility facilities, the purpose of the Act and section 13(b) is preserved because a regu-

4. As a threshold matter, Condemnees question whether we must remand to the trial court because the trial court failed to address all the issues raised and did not order Condemnees to file a Statement of Matters Complained Of pursuant to Pa. R.A.P.1925(b). We conclude that no remand is necessary. This appeal is based on an undefined key term in the Act and, as such, is a matter of statutory construction and a pure question of law; therefore, this court can address the matter on appellate review. *See Commonwealth v. Gilmour Manufacturing Co.*, 573 Pa. 143, 822 A.2d 676 (2003).

5. When engaging in statutory interpretation or construction, the objective is to ascertain and effectuate the intention of the General Assembly and to construe every statute, if possible, so as to give effect to all of its provisions. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). Generally, words and phrases within a statute are construed in accordance with their common and approved usage, but technical words and phrases shall be construed according to their peculiar and appropriate meaning or definition. 1 Pa.C.S. § 1903. However, when the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering numerous factors, including: "(4) the object to be obtained; ... [and] (6) the consequences of a particular interpretation." 1 Pa.C.S. § 1921(c). More-

over, it is presumed that the General Assembly does not intend an absurd result. 1 Pa. C.S. § 1922(1).

6. In section 2 of the Act, the General Assembly states that:

> [a]griculture in many parts of the Commonwealth is under urban pressure from expanding metropolitan areas. This urban pressure takes the form of scattered development in wide belts around urban areas, and brings conflicting land uses into juxtaposition, creates high costs for public services, and stimulates land speculation. .... Many of the agricultural lands in the Commonwealth are in jeopardy of being lost for any agricultural purposes. .... It is the purpose of this act to provide means by which agricultural land may be protected and enhanced as a viable segment of the Commonwealth's economy and as an economic and environmental resource of major importance.

3 P.S. § 902. Additionally, the Act proposes to encourage landowners to make long-term commitments to agriculture by offering financial incentives and security in land use, protecting farming operations from incompatible non-farm land uses that could render farming impracticable and assuring the permanent conservation of the agricultural lands of the Commonwealth. *Id.*

lated public utility is *already* required to seek approval of its plans *before* exercising its powers of eminent domain.[7] *See* section 1511 of the Associations Code, 15 Pa. C.S. § 1511; section 1104 of the Public Utility Code, 66 Pa.C.S. § 1104. Moreover, requiring non-regulated entities to seek approval from the Board does not foreclose the ability to condemn ASA land; rather, the entity would merely have to comply with the general provisions of section 13(b) and seek approval of its condemnation plans.

■ Additionally, we agree with Condemnees that because section 13(b) makes reference to the Public Utility Commission (PUC), it is proper to rely on the Public Utility Code (Code), 66 Pa.C.S. §§ 101–3316, to define the relevant language of the Act. The courts in both *Adams Electric Cooperative, Inc. v. Commonwealth*, 853 A.2d 1162 (Pa.Cmwlth.2004), and *Commonwealth v. Merritt Chapman & Scott Corp.*, 432 Pa. 584, 248 A.2d 194 (1968), recognized the relationship between the subject matter of the Code and the definition of "public utility." In *Adams Electric*, we considered whether the definition of "public utility" in the act commonly known as the Public Utility Realty Tax Act, (PURTA),[8] applied to all electric coopera-

tives. In concluding that it only applied to those electric cooperatives providing public utility services to the general public, we noted that, while PURTA is a tax statute, its subject matter is related to that of the Code, which excludes from the definition of public utility any "bona fide cooperative association which furnishes services only to its ... members on a nonprofit basis." 66 Pa.C.S. § 102. Similarly, here, although the Act is an agricultural statute, the subject matter of section 13(b) of the Act relates to those entities included in the definition of "public utility" and, therefore, reliance on the Code is appropriate

In *Merritt Chapman*, our supreme court held that a contractor who had worked for the Turnpike Commission was ineligible for the Sales and Use Tax (Use Tax)[9] public utility exclusion because the Turnpike Commission was not a public utility. The court relied on the Code to define "public utility" and stated:

> ... the Turnpike Commission can only be classified as a public utility if it is a 'person or corporation.' ... [I]f the Turnpike Commission is an agency of the state, it is not a 'person or corporation' within the [Code]. It is clearly not a corporation, and [the Code] ... defines 'person' as 'individuals, partnerships, or

---

**7.** Adoption of the broad definition suggested by the Authority would allow *any* institution providing a public utility service to exercise its power of eminent domain to condemn ASA land, so long as the facility is underground. To support its assertion that a broad definition is consistent with the purposes of the Act, the Authority points to section 13(d)(2)(ii)(A) of the Act, which states that the Board or other reviewing body shall approve the proposed condemnation if it determines that the condemnation would not have an *unreasonably adverse effect* upon the preservation and enhancement of agricultural or municipal resources or on the environmental or comprehensive plans of the area. The Authority submits that the underground utility facility here, an underground water line, will not in its

intrinsic nature have an adverse impact on agricultural uses. However, the Authority forgets that its argument would allow an entity condemning the land, rather than an independent regulatory body, to decide whether its own condemnation would have an adverse effect on agricultural uses. Thus, we reject the Authority's assertion that its definition is consistent with the purposes of the Act.

**8.** Article XI–A of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, added by section 3 of the Act of July 4, 1979, P.L. 60, *as amended*, 72 P.S. §§ 8101–A to 8112–A.

**9.** *See* the Sales and Use tax provisions of Tax Reform Code of 1971.

associations other than corporations. . . .' This definition does not include an instrumentality of the state. *Merritt Chapman*, 432 Pa. at 586, 248 A.2d at 195 (footnotes omitted).

In the present matter, we conclude that the Authority is not a person because it is not an individual, partnership, or association other than a corporation. Further, the Authority is not a corporation because the Code specifically excludes "municipal corporations," a term that encompasses municipal authorities, from the definition of "corporation." Thus, utilizing the Code's definition of public utility, we conclude that the Authority is not a public utility for the purposes of applying for the exemption in section 13(b) of the Act.

Finally, we recognize that the General Assembly does not intend a result that is absurd or unreasonable. 1 Pa.C.S. § 1922(1). In section 11 of the Act, the legislature protects ASA land by limiting the power of municipalities and political subdivisions to enact local laws or ordinances which would unreasonably restrict farm structures or practices, 3 P.S. § 911(a), or to enact laws or ordinances that define public nuisance to include any normal agricultural activity or operation occurring within an ASA, 3 P.S. § 911(b). To define "underground public utility facility" as the Authority proposes would lead to an absurd result because ASA land would be protected from some detrimental governmental actions, such as anti-farming ordinances and public nuisance actions, but would remain subject to municipal authority condemnation *without any* regulatory approval or determination of how the condemnation would affect the protected use of the land.

We are unpersuaded by the Authority's argument that the definition of "underground public utility facility" should include municipal authorities providing public utility services. First, the Authority points out that section 13(b) already exempts PUC reviewed and approved public utility facilities, and the Authority contends that narrowly defining an "underground public utility facility" to apply only to regulated public utilities would improperly render that exemption superfluous. 1 Pa.C.S. § 1903; *Commonwealth v. Gilmour Manufacturing Co.*, 573 Pa. 143, 822 A.2d 676 (2003). The Authority concludes that we must define "underground public utility facility" broadly so as to avoid this surplusage.

However, a close reading of section 13(b) establishes that there would be no overlap. In fact, under Condemnees' narrow definition, there are two separate exemptions: one for regulated underground public utility facilities and one for any public utility facilities subject to PUC review of the environmental effects of the public utility before approval. The general idea of the exemptions in section 13(b) is to prevent repetitive review of the same condemnation by multiple regulatory agencies. By excluding those public utilities already subject to regulatory review, the purpose of the Act is met without multiple reviews of the same condemnation.

Second, the Authority contends that a narrow definition of public utility is not supported by Pennsylvania case law, which historically has treated municipal authorities providing public utility services as public utilities. Relying on *Ernest Renda Contracting Co., Inc. v. Commonwealth*, 516 Pa. 325, 532 A.2d 416 (1987), the Authority maintains that this court should not limit the exemption granted to an "underground public utility facility" as applicable only to regulated public utility facilities. However, the Authority's reliance on *Renda* is misplaced in the present context.

In *Renda*, our supreme court found it appropriate to treat municipal authorities

providing public utility services as public utilities *for the purpose of the public utility exclusion* from the Use Tax. The court concluded that such treatment was consistent with the purpose of the Use Tax exclusion to save public utilities and, thus, the public, the cost of the tax, which would undoubtedly be passed on to the public utility. *Renda.*

Unlike the situation in *Renda,* where treating municipal authorities as public utilities served the purpose of the Use Tax, here the purpose of the Act is not served by allowing any entity providing public utility services to condemn protected lands. To the contrary, as previously stated, only if the exemption is based on the entity's status as a regulated "public utility," whose condemnation plans are reviewed by a regulatory agency, will the Act's purpose be served by ensuring that the possible effects of a particular condemnation are considered *before* the condemnation occurs. Thus, because the Authority is not regulated by a government agency, it does not qualify as a "public utility" entitled to the exemption in section 13(b) of the Act, and, therefore, the trial court erred in overruling Condemnees' preliminary objections.

Accordingly, we reverse.

### ORDER

AND NOW, this 2nd day of February, 2006, the May 2, 2005, order of the Court of Common Pleas of Crawford County overruling the preliminary objections of Patricia E. Gillette, Mary E. Burnham, Brian E. Gillette, Jason M. Gillette, Jeremy M.O. Burnham, Robert J.S. Burnham, Chad Kunz, John O.S. Burnham and Ruth E. Burnham is hereby reversed.

DISSENTING OPINION BY Judge COHN JUBELIRER.

I respectfully dissent.

I believe the majority errs by relying on the definitions section of the Public Utility Code (Code) to define the term "underground public utility facility" as used in the Agricultural Area Security Law (Act). The Act, which does not define the term "underground public utility facility," also does not, either expressly or by implication, make any reference to the Code.

Mere use of the term "public utility" in a statute does not require a court evaluating the statutory language to import the definition in the Code. *Ernest Renda Contr. Co., Inc. v. Commonwealth of Pa.,* 516 Pa. 325, 333, 532 A.2d 416, 420 (1987). In *Renda,* the Pennsylvania Supreme Court determined that a municipality providing sewage and water service, although not a public utility as defined by the Code, is a public utility for purposes of the Tax Reform Code of 1971 (Tax Code),[1] and so, was entitled to a public utility tax exclusion. In reaching this conclusion, the Court noted that

> Granted, municipal corporations are not, under definitions set forth in the [Code], considered to be "public utilities" for purposes of the Code. Nevertheless, municipalities have long been recognized as providers of public utility services....

*Renda,* 516 Pa. at 333, 532 A.2d at 420 (citations omitted). The Court reasoned that applying the public utility exclusion to municipalities comported with the Tax Code's purposes, which was to save the cost from the public, who would ultimately bear it. *Id.* at 334, 532 A.2d at 420–21.

Similarly, in this case, as in *Renda,* we must look to the purposes of the Act, as compared to the Code, before we assume that the Code definition applies. One pur-

---

1. Act of March 4, 1971, P.L. 6, *as amended,*     72 P.S. §§ 7101–10004.

pose of the Code is to define which entities are regulated by the Public Utility Commission (PUC), which oversees rates, service quality, and the public necessity and convenience of entities, and for which regulation the entities are assessed. *See, e.g.,* 66 Pa.C.S. §§ 510, 1301. The stated purpose of the Act is to prevent urban sprawl from encroaching and eliminating Pennsylvania agricultural lands.[2] Thus, the definition can be drawn from the purposes of the Act, and does not require recourse to the Code for discerning the meaning or intent of the words.

The majority infers, without citing any authority, that because the PUC regulates public utilities under the Code, this regulation would effectuate the purposes of the Act. However, it is not within the PUC's statutory mandate to prevent urban sprawl or to preserve agricultural lands. The majority limits the exemption for "underground public utility facilities" in Section 13(b) of the Act[3] to public utilities regulated by the PUC because:

> By exempting only *regulated* underground public utility facilities, the purpose of the Act and section 13(b) is preserved because a regulated public utility is *already* required to seek approval of its plans *before* exercising its powers of eminent domain. *See* section 1511 of the Associations Code, 15 Pa. C.S. § 1511; section 1104 of the Public Utility Code, 66 Pa.C.S. § 1104.

(Maj. Op. at 9–10) (footnote omitted)(emphasis in original). The majority further reasons that

In view of the Act's purpose, it is reasonable to conclude that the General Assembly intended all condemnations of [Act protected] land to be subject to regulatory review *prior* to condemnation, *ensuring that due consideration is given to the impact that condemnations have on the agricultural use of the land.*

(Maj. Op. at 9) (emphasis in original and emphasis added). However, neither of the two sections cited requires the PUC to consider the impact of condemnations on the agricultural use of the land.

The Code section cited, and the related provisions of the Code, provide that hearings are necessary prior to issuing the initial certificate of public convenience; however, none of these provisions require a hearing or review of any subsequent specific project arising from the same utility service within a certificated service area. Additionally, to the extent any review is necessary, Section 1102 of the Code provides that the PUC shall grant a certificate only if "the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa.C.S. § 1103(a). In contrast, the Act requires the Agricultural Condemnation Approval Board (Board) to approve a condemnation only if it determines that:

> (A) the proposed condemnation would not have an unreasonably adverse affect upon the preservation and enhancement of agriculture or municipal resources within the area or

---

2. The statement of legislative findings for the Act provides that:
> Agriculture in many parts of the Commonwealth is under urban pressure from expanding metropolitan areas. This urban pressure takes the form of scattered development in wide belts around urban areas, and brings conflicting land uses into juxtaposition, creates high costs for public ser-

vices, and stimulates land speculation. When this scattered development extends into good farm areas, ordinances inhibiting farming tend to follow, farm taxes rise, and hopes for speculative gains discourage investments in farm improvements. . . .
> 3 P.S. 902.

3. 3 P.S. § 913(b).

upon the environmental and comprehensive plans of the county, municipality and the Commonwealth, or upon the goals, resource plans, policies or objectives thereof. . . .

3 P.S. § 913(d)(1)(2)(ii)(A). The lens through which the respective reviewing authorities examines any project is, thus, quite different—the PUC considers such factors as convenience of the public, while the Board focuses on preserving the agricultural nature of the community. Convenience and preservation are often adversary principles, such that a regulatory oversight premised on the former, may be at the expense of the latter.

The majority also cites Section 1511 of the Associations Code, 15 Pa.C.S. § 1511. This section specifically authorizes public utilities to exercise eminent domain for any of several purposes which include water accumulation and distribution. The section also discusses when PUC approval is necessary, limiting such approval to various types of poles and aerial facilities (e.g., utility poles, aerial wires); however, nothing from this section requires **PUC**

review of an entity's efforts to install **underground** public utility facilities.

In the absence of any indication in the Act that the term "underground public utility facility" is intended to be defined by legislation that has a totally different purpose, like *Renda,* I would merely interpret the term according to its plain meaning. "Public utility" can be commonly defined as "[a] company that provides necessary services to the public, such as telephone lines and service, electricity, and water." *Black's Law Dictionary* 1582 (8th ed.1999). The meaning of "underground" is clear, and a common definition for "facility" is "[s]omething . . . that is built, installed, or established to serve a particular purpose." *Merriam–Webster Collegiate Dictionary* 447 (11th ed.2004). The water services provided here are necessary services, and the pipes and associated hardware are built to serve the purpose of providing the water service.

Therefore, I do not believe the majority's reasoning supports a legislative intent to import the definitions of the Code into the Act.[4] As I would find the use in ques-

---

4. Commentators have noted that, even as of ten years ago, the Act has saved thousands of acres of Pennsylvania farmland, and that "[t]he success of this program may lie in its emphasis on local review." Joseph Sabino Mistick, *Recent Developments in Pennsylvania Land Use Planning,* 34 Duq. L.Rev. 533, 534 (1996). With such a focus on local review, it seems unlikely that the General Assembly premised the exceptions in Section 13(b) on oversight by a non-local bureaucracy. In contrast, it seems far more congruent with the Legislative intent that the exception is read in a manner that, effectively, authorizes a local water authority that works exclusively within a particular locale, and is subject to local review, to bury its pipes four feet beneath the surface.

Additionally, the Administrative Code of Boards and Commissions, in discussing the make-up, responsibilities and jurisdiction of the Board, specifically precludes the Board from having jurisdiction over cases involving

underground pipes used to transport liquid waste. Section 306 of the Administrative Code of 1929 (Administrative Code), Act of April 9, 1929, P.L. 177, added by Section 1 of the Act of December 7, 1979, P.L. 478, 71 P.S. § 106. Specifically, this section provides that:

(d) The [B]oard shall have jurisdiction over condemnation for the following purposes:

\* \* \*

(2) Disposal of solid or liquid waste material, *but not including underground pipes used to transport waste.*

71 P.S. § 106(d)(2)(emphasis added). As the Administrative Code and the Law "relate to the same . . . things" the two are "in pari materia" and must be construed together. *See Hutskow v. Washowich,* 156 Pa.Cmwlth. 655, 628 A.2d 1202, 1207 (1993), *pet. for allowance of appeal denied,* 536 Pa. 633, 637 A.2d 293 (1993). Removing the placement of underground pipes from the jurisdiction of

tion in this case falls within the underground public utility facility exemption of Section 13(b), I would affirm the trial court's decision.

For these reasons, I believe the trial court properly decided this issue and would, therefore, affirm.

the Board shows a legislative intent to allow uses similar to those in the within case, without requiring approval of the Board.