*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-BG-682

IN RE JOHN F. KENNEDY AND KATHLEEN A. DOLAN, RESPONDENTS.

Suspended Member and Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration Nos. 413509 & 428925)

On Report and Recommendation
of the Board on Professional Responsibility
(Bar Docket No. 16-BD-42)

(Argued March 8, 2022                    Decided August 25, 2022)

(Amended September 1, 2022)[*]

*Noah A. Clements*, with whom *Abraham C. Blitzer* was on the brief, for respondents.

*Sean P. O'Brien*, Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, *Myles V. Lynk*, Senior Assistant Disciplinary Counsel, and *Rebecca A. Neal*, Senior Assistant Disciplinary Counsel, were on the brief, for petitioner.

Before GLICKMAN and DEAHL, *Associate Judges*, and STEADMAN, *Senior Judge*.

---

[*] We granted Disciplinary Counsel's August 25, 2022, unopposed motion to consider clarification, principally relating to Kennedy's *nunc pro tunc* status.

STEADMAN, *Senior Judge*: The Board on Professional Responsibility ("the Board") has recommended that respondent John F. Kennedy be disbarred for intentional misappropriation, among other violations of the District of Columbia Rules of Professional Conduct, in connection with the litigation and settlement of a collective action during which his firm took 67% of the settlement award as attorney's fees without client authorization. The Board has also recommended that respondent Kathleen A. Dolan be suspended for nine months for negligent misappropriation and other ethics rules violations in connection with the same litigation and settlement, with reinstatement subject to certain conditions.[1] We adopt the Board's recommendations.

## I.    Factual Summary

Respondents are a married couple and the sole attorneys in their law firm, Kennedy & Dolan. In the early 2000s, current and former security officers at Inter-Con Security Systems ("Inter-Con") hired respondents to sue their employer for

---

[1] On consideration of the Board's report and recommendation, we ordered on February 23, 2021, that respondents show cause why they should not be suspended pending final disposition of this proceeding. D.C. Bar R. XI, § 9(g). Finding that Kennedy did not make the showing required, we suspended him on May 4, 2021, pending final disposition of this proceeding. *Id.* We did not suspend Dolan because her recommended suspension was for less than one year. *Id.* Kennedy timely filed the requisite affidavit under D.C. Bar R. XI, § 14(g) on June 10, 2021.

violations of the Fair Labor Standards Act (FLSA) and the D.C. Wage Payment and Collection Law, based on Inter-Con's practice of docking its employees fifteen minutes' worth of wages if they arrived even a minute or more late to work and its failure to pay minimum wages. Respondents pursued the lawsuit in arbitration as a collective action, and they mailed over 100 notices and opt-in forms to potential plaintiffs. The notice stated that those who joined the lawsuit would "not be required to pay attorney's fees directly. The plaintiffs' attorneys will receive a part of any money judgment entered in favor of the class." Over 100 claimants opted in.

A few years into the litigation, respondents initiated settlement negotiations by sending Inter-Con a settlement offer for $700,000. Respondents had not discussed this offer with any of the claimants. It was not until this point that respondents made efforts to enter into attorney-client agreements with each of the claimants. These agreements said that respondents would "be paid at 40% of the recovery or at an hourly rate pursuant to the applicable Adjustable [sic] Laffey Matrix in Washington, DC at [the attorneys'] choosing upon recovery or upon application to the arbitrator for payment of attorney[']s fees and costs pursuant to applicable statutes."

Kennedy held a client meeting shortly thereafter, at which he informed the claimants that he had begun settlement negotiations, and he asked them to sign authorization forms to allow him to settle for "as much as he believes is reasonable for any and all claims [each claimant] may have had with Inter-Con arising from this action and give him the power to sign any and all papers [and] releases for [him/her]." He also sent letters to the claimants who did not attend the meeting, telling them to sign the authorization form or "risk being excluded from the case and/or not getting anything from it." He did not provide any of the claimants with details of the settlement negotiations.

Kennedy subsequently entered into a settlement agreement with Inter-Con for $320,000 (later reduced to $310,000). The agreement stated that "each side agree[d] to separately bear all of its own costs and attorney's fees" and that the settlement was "inclusive of attorney['s] fees and costs." The agreement also provided that respondents would instruct Inter-Con on how much of the settlement fund to send each client and how much of the fund to send respondents as attorney's fees; the agreement did not specify any amounts or percentages related to how the lump sum would be divided. Kennedy signed each client's name individually to the agreement, with the authority to do so from the settlement authorization form the clients had signed.

Kennedy determined how much of the settlement money each client would receive based on a formula he devised unilaterally that included the length of the client's employment at Inter-Con and whether or not he or she testified in a deposition for the case. He advised Inter-Con how much to pay each client, and Inter-Con sent each client a check for that amount. He also advised Inter-Con how much to pay Kennedy & Dolan in attorney's fees, and Inter-Con sent the firm a check for that amount. In total, the clients received about 33% of the total settlement ($100,086.68), and Kennedy & Dolan received the remaining 67% as fees ($209,913.32). The clients were not made aware of the total settlement award amount nor of the amount of attorney's fees respondents received. Each client was only aware of the final amount he or she individually received and did not receive any sort of accounting of the distribution of the settlement funds. The Hearing Committee found, based on Kennedy's testimony during the disciplinary proceedings, that "Kennedy deliberately concealed the settlement details because he believed disclosing the individual settlement amounts and the amount of [r]espondents' fees would put the settlement at risk."

Disciplinary Counsel charged Kennedy and Dolan with two counts of misconduct arising from the Inter-Con litigation. Count I related to respondents'

failure to consult their clients on the details of the settlement agreement, and Count II related to respondents' misappropriation of client funds, including taking 67% of the settlement proceeds as attorney's fees without their clients' knowledge or approval. Evidence presented during the disciplinary proceedings indicated that Kennedy was principally involved in the client communications and settlement negotiations and that Dolan had limited involvement in the litigation, though she managed the trust account and was aware of the terms of the settlement agreement.

Regarding Count I, the Hearing Committee found that both respondents violated Rules 1.2(a) (failure to abide by clients' decisions and consult clients), 1.4(a-c) (failure to communicate adequately with clients), 1.5(b) (failure to communicate the basis or rate of attorney's fees within a reasonable time after commencing representation), and 1.8(f) (failure to obtain informed written consent of an aggregate settlement of claims for multiple clients), and that Kennedy alone violated Rule 8.4(c) (dishonesty). Regarding Count II, the Hearing Committee found that both respondents violated Rules 1.5(a) (unreasonable fee), 1.15(a) (misappropriation of client funds and recordkeeping violations), and 1.15(c) (failure to notify clients promptly of receipt of funds). The Hearing Committee found that Kennedy's Rule 1.15(a) misappropriation was intentional, due to the evidence of Kennedy's orchestration of the scheme to keep the clients unaware of the details of

the settlement agreement and its distribution, and that Dolan's misappropriation was only negligent, due to the lack of evidence of Dolan's direct knowledge of, or participation in, the scheme.

The Hearing Committee Recommended that Kennedy be disbarred and that Dolan be suspended for a period of nine months with reinstatement conditioned on a demonstration of fitness, including a required continuing legal education course on law practice management and accounting. The Board agreed with and incorporated the Hearing Committee's findings in its Report, and it agreed with most of the Committee's conclusions of law and recommended sanctions, with the exception of the Committee's recommendation that Dolan be required to prove fitness. Instead of the fitness requirement, the Board recommended that Dolan be required to take a practice management course, complete six hours of continuing legal education on trust account management, and serve one year of probation under the supervision of a practice monitor, with her failure to cooperate with the practice monitor resulting in revocation of her probation with a requirement that she demonstrate fitness before reinstatement.

## II.    Standard of Review

Under D.C. Bar Rule XI § 9(h)(1), this court "shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." However, this court reviews the Board's legal determinations and determinations of ultimate fact de novo. *See In re Samad*, 51 A.3d 486, 495 (D.C. 2012) (per curiam).

## III.   Analysis

Though we recognize that misappropriation is a controlling issue here because a finding of intentional misappropriation, with rare exceptions, results in automatic disbarment, *see Matter of Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc), the issues surrounding respondents' failure to consult their clients on the details of the settlement agreement lay a foundation for our discussion of the misappropriation issue. Therefore, our analysis proceeds, as the Board's did, first with a discussion of Count I and then of Count II. We conclude with a brief discussion of sanctions.[2]

---

[2] Respondents filed a motion to dismiss the entire proceeding based on Board Rule 2.9(b), which provides that Disciplinary Counsel shall not contact a respondent's client when the client is not a complainant without first obtaining the respondent's consent, unless "Disciplinary Counsel believes the client has knowledge of a matter under investigation in a docketed case." We agree with the

**A.  Count I**

Count I relates to respondents' communication – or lack thereof – with their clients regarding the contents of the settlement agreement and regarding respondents' payment to themselves of attorney's fees out of the settlement award. Respondents take issue with several aspects of the Board's findings related to Count I, though they primarily challenge the Board's determination that they violated Rule 1.8(f) by failing to obtain their clients' informed consent to enter into the settlement agreement and Rule 8.4(c) by inducing the clients to sign a settlement authorization form.[3]

---

Board that the Disciplinary Counsel did not violate that rule under the circumstances respondents reference.

[3] Additionally, respondents take issue with the Board's determination that respondents violated Rules 1.2(a), 1.4(a-c), and 1.5(b), all of which also relate to respondents' failure to communicate to the clients the terms of the settlement agreement and the amount of attorney's fees they took from the award. Respondents argue that they adequately communicated that information to the clients, but we agree with the Board that respondents' communication to each client individually regarding the amount he or she would receive and notice to the clients that Inter-Con would pay their attorney's fees was insufficient to satisfy the rules' requirements that attorneys inform and consult their clients regarding their representation, share settlement information with their clients, and communicate to their clients the basis or rate of attorney's fees.

## 1. Rule 1.8(f)

Rule 1.8(f) provides, "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims for or against the clients . . . unless each client gives informed consent in a writing signed by the client after consultation . . . ." Respondents take issue with the Board's determination that they violated Rule 1.8(f), arguing that they fell under a class action exception to that rule.[4]

---

[4] Respondents point to Comment 12 to Rule 1.8, including the final sentence, as creating this exception. That Comment in full provides:

> Differences in willingness to make or accept an offer of settlement are among the risks of common representation of multiple clients by a single lawyer. Under Rule 1.7, this is one of the risks that should be discussed before undertaking the representation, as part of the process of obtaining the clients' informed consent. In addition, Rule 1.2(a) protects each client's right to have the final say in deciding whether to accept or reject an offer of settlement and in deciding whether to enter a guilty or *nolo contendere* plea in a criminal case. The rule stated in paragraph (f) of this rule is a corollary of both Rules 1.7 and 1.2(a), and provides that, before any settlement offer or plea bargain is made or accepted on behalf of multiple clients, the lawyer must inform each of them about all the material terms of the settlement, including what the other clients will receive or pay if the settlement or plea offer is accepted. Lawyers representing a class of plaintiffs or defendants, or those proceeding derivatively, must comply with applicable rules regulating notification of class members, compensation of class counsel, and other procedural requirements designed to ensure adequate protection of the entire class.

Respondents do not provide any support in our case law for the existence of an exception to Rule 1.8(f) for attorneys representing clients in class actions. Even if we were to recognize such an exception, we are unpersuaded that respondents can take advantage of it. Respondents contend that an exception to Rule 1.8(f) should cover not just Rule 23 class actions but also collective actions. We disagree. If we recognized an exception to Rule 1.8(f) for certified class actions, it would be because class counsel may not have a full attorney-client relationship with each class member and because Rule 23 contains requirements, such as notice and court approval, that protect class members from abusive settlement practices by class counsel. *See* Super. Ct. Civ. R. 23(e). By contrast, respondents had individual attorney-client agreements with each Inter-Con claimant, and the Inter-Con litigation was not governed by those Rule 23 requirements. The absence of those safeguards to protect collective action clients from the unfair or unethical settlement of their claims necessitates maintaining the protections of Rule 1.8(f) for collective actions such as the one in this case.[5] Therefore, we agree with the Board that respondents were still

---

[5] Other jurisdictions have also determined that an exception to the aggregate settlement rule does not apply to non-class action cases because of the lack of Rule 23 safeguards. *See, e.g.*, *Knisley v. City of Jacksonville*, 497 N.E.2d 883, 887-88 (Ill. App. Ct. 1986), *appeal denied*, 505 N.E.2d 353 (Ill. App. Ct. 1987) (noting the distinction for the purposes of the aggregate settlement rule between class action suits and joinder actions because court approval of settlements is required in class actions and not in joinder actions); *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d

bound to comply with Rule 1.8(f). Having failed to obtain their clients' informed written consent to make an aggregate settlement of their claims, respondents violated Rule 1.8(f).

### 2. Rule 8.4(c)

The Board found that Kennedy violated Rule 8.4(c) when he intentionally concealed the terms of the settlement agreement from the clients and when he told the clients they risked being excluded from the case if they did not sign the settlement authorization form.[6] Rule 8.4(c) provides, "It is professional misconduct for a lawyer to . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Respondents argue that Kennedy did not violate this rule because the language he used to get the clients to sign the settlement form was merely to "stimulate any response" from clients who had been previously unresponsive. Respondents do not address whether Kennedy violated Rule 8.4(c) in concealing the terms of the settlement agreement.

---

512, 514-15, 522 (N.J. 2006) (determining that the aggregate settlement rule applied to a non-class action lawsuit pursued collectively on behalf of 154 plaintiffs).

[6] The Board did not find that Dolan violated Rule 8.4(c) because she was not involved enough in the relevant communications with the clients. Neither party challenges this determination, and we agree.

We find respondents' only argument unpersuasive: an admission that the language used was meant to stimulate a response from the clients only supports the determination that it was deliberately misleading and deceitful. Coupled with the Hearing Committee's finding that Kennedy intentionally concealed the settlement terms from his clients in an effort to prevent them from putting the settlement at risk, the facts support the Board's determination that Kennedy violated Rule 8.4(c).

## B.    Count II

Count II relates to respondents' keeping for themselves 67% of the settlement award without client authorization, and respondents primarily challenge the Board's determination that this constituted misappropriation. Misappropriation has occurred if the following three elements are met: "(1) . . . client funds were entrusted to the attorney; (2) . . . the attorney used those funds for the attorney's own purposes; and (3) . . . such use was unauthorized." *In re Travers*, 764 A.2d 242, 250 (D.C. 2000). Because it is undisputed that respondents took the funds in question to use for their own purposes, the disputed elements here are the first and third.

Respondents argue that the attorney's fees they received from the settlement funds cannot be considered "entrusted client funds" because the $210,000 check they received from Inter-Con was made out to them and was specifically for attorney's fees; therefore, the clients had no interest in that portion of the funds. They take issue with the Hearing Committee's reasoning, which the Board endorsed, that the "economic substance" of the settlement agreement was the "equivalent of a settlement check jointly payable to a lawyer and client," arguing that such a theory would be "unprecedented." Respondents also argue that they could not have misappropriated the funds they took as attorney's fees because they were entitled to those fees under the FLSA.

Respondents' arguments are unpersuasive. The Hearing Committee found that respondents directed Inter-Con to pay them out of the settlement award – funds in which the clients surely had an interest. Respondents may have had an interest in the funds as well, but their interest was in a yet-to-be-determined portion as attorney's fees. As this court reasoned in *In re Haar*,

> [I]t is important to keep clearly in mind the distinction between a right to payment and a right to particular property. When a lawyer performs legal work for another, the client of course has an obligation to pay the lawyer's fee. But absent agreement or a statutory lien, the lawyer has no right to any particular property of the debtor-client, including the proceeds of litigation. The lawyer as an

> unsecured creditor has no intrinsic right of self-help, and even where a specific property interest – a charging lien – is created, the right to self-help is strictly limited by law and, in the lawyer's case, by the rules of professional conduct.

698 A.2d 412, 424 (D.C. 1997). Thus, respondents had no right to help themselves to the settlement funds without authorization from the clients to take an agreed upon amount of the funds as attorney's fees; until such an agreement was reached, the entire settlement award was client funds. And because the settlement agreement provided that respondents would unilaterally determine where the money would go and how it would be divided, these client funds were "entrusted" to respondents.[7]

With regards to whether the FLSA entitled respondents to the funds they took, the statute only provides that "[t]he court in [an FLSA] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant . . . ." 29 U.S.C. § 216(b). The statute does not state, or even imply, that an attorney is entitled to unilaterally take any particular portion of a settlement award resulting from the out-of-court settlement of an FLSA claim;

---

[7] By signing the agreement on behalf of each of the clients, respondents actually entrusted the funds to themselves on behalf of their clients.

rather, it pertains specifically to court-awarded attorney's fees that accompany court-awarded judgments.[8]

Having established that the portion of the settlement award respondents took as attorneys' fees were "entrusted client funds," the remaining question is whether the clients authorized respondents to take the funds they took. We agree with the Board that the answer must be no. Respondents made no effort to get the clients' consent to take the fees they actually took: they merely sent each client his or her own check and quietly kept the rest for themselves.[9] The Hearing Committee found, based on Kennedy's own admission at the hearing, that he did not inform the clients of the settlement details because he feared the clients would put the settlement at risk if they knew that information. Therefore, the clients could not have provided informed consent for respondents to take what they took of the settlement as fees.[10]

---

[8] Nor does the statute provide respondents a viable defense to Rule 1.5(a) (unreasonable fees). Respondents point out that attorney's fees awards in FLSA cases can be large relative to the often small amount of each individual claim, *see Fegley v. Higgins*, 19 F.3d 1126, 1134-35 (6th Cir. 1994), but no determination of attorney's fees was made by the court here, and respondents do not present any analysis that would justify the entire amount of the fee.

[9] Respondents point out the asserted absence of any client complaints, but this can hardly substitute for affirmative approval in the circumstances here.

[10] Respondents do not argue that they derived consent from the provision in the attorney-client agreements that they would be paid 40% of the recovery or at an hourly rate pursuant to the Laffey Matrix. Even if they did, respondents would have

Disbarment is the presumptive sanction for misappropriation unless "the misconduct resulted from nothing more than simple negligence." *See Matter of Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc). In cases where an attorney took client funds inadvertently or based on a good faith belief that he or she was authorized to do so, this court usually finds only negligent misappropriation. *See, e.g.*, *Haar*, 698 A.2d at 422; *In re Choroszej*, 624 A.2d 434, 436 (D.C. 1992) (per curiam). As the findings here demonstrate, Kennedy knew that he did not have the clients' authorization to take the fees he took from the settlement funds, having not even attempted to obtain such authorization, and he does not allege that he took the fees inadvertently. "Good faith" cannot encompass a belief that an attorney was entitled to unilaterally take whatever amount of a client's settlement award in attorney's fees as the attorney saw fit, without consulting the client as to that amount.

Additionally, this court has found relevant in negligent misappropriation cases whether an attorney attempted to conceal his or her conduct. *See, e.g.*, *Travers*, 764 A.2d at 249 (noting that the attorney was in "no way trying to mislead [the court] or conceal his conduct"); *Haar*, 698 A.2d at 422 (noting that the attorney "did not

---

nevertheless misappropriated the difference between 67% and the amount that would have resulted from that fee arrangement.

attempt to conceal his conduct from his client" and "informed her of what he proposed to do before withdrawing the" money). By contrast, the Board in this case determined that Kennedy "deliberately did not share settlement details with clients to ensure that the settlement would be finalized." We must agree with the Board that Kennedy's conscious actions throughout the settlement process rendered a conclusion of intentional misappropriation requiring disbarment. With respect to Dolan, neither party challenges the Board's determination that Dolan committed only negligent misappropriation, and we agree that the evidence supports that determination.

## C. Sanctions

Because we determine that Kennedy engaged in intentional misappropriation and see no extraordinary circumstances that mitigate his misconduct,[11] we agree with the Board's recommendation that he be disbarred. *See Addams*, 579 A.2d at 191. We also find the Board's recommended nine-month suspension for Dolan to be

---

[11] Respondents urge us to apply any ruling in their case prospectively because of the "new" and "novel" applications of the misappropriation standard and of Rule 1.8(f) to collective actions. However, we have simply applied the well-established standards for misappropriation and the plain text of Rule 1.8(f). We see no reason to apply this ruling prospectively.

consistent with other dispositions for comparable conduct, and neither party specifically challenges Dolan's sanction. *See, e.g.*, *In re Herbst*, 931 A.2d 1016, 1016-17 (D.C. 2007) (per curiam) (ordering a nine-month suspension for an attorney who committed negligent misappropriation as well as multiple other rule violations); *In re Bailey*, 883 A.2d 106, 123 (D.C. 2005) (same). Respondents also do not challenge the Board's recommendation that Dolan be required to comply with certain conditions of reinstatement and that her failure to comply with the conditions will result in the revocation of her probation and imposition of a requirement that she demonstrate fitness before reinstatement.[12]

\* \* \* \*

---

[12] In addition, having recommended a showing of fitness by both respondents before reinstatement, the Hearing Committee recommended that the issue of disgorgement by respondents of at least a portion of the attorney's fees by payment to the Clients' Security Fund be addressed during reinstatement proceedings, as is common. *See In re Hager*, 812 A.2d 904, 923 (D.C. 2002). In rejecting a showing of fitness (except in the event of breach) in lieu of imposing a number of conditions to Dolan's automatic reinstatement, the Board did not include a disgorgement requirement, which we note would place that initial burden on Dolan, the lesser offender. We therefore leave that issue to be determined as part of any reinstatement proceedings on fitness that arise in due course.

It is therefore ORDERED that John F. Kennedy is disbarred from the practice of law in the District of Columbia, *nunc pro tunc* to May 4, 2021.[13]  It is FURTHER ORDERED that Kathleen A. Dolan is suspended from the practice of law in the District of Columbia for a period of nine months and that, as a condition of reinstatement to membership in the Bar, she shall complete a practice management course, six hours of continuing legal education on trust account management, and one year of probation under the supervision of a practice monitor, with her failure to cooperate with the practice monitor resulting in revocation of her probation and imposition of a requirement that she demonstrate fitness before reinstatement. Respondent Dolan's attention is called to the requirements of D.C. Bar R. XI, § 14 and the relationship of compliance therewith to eligibility for reinstatement as provided in D.C. Bar R. XI, § 16(c).

---

[13] See note 1 *supra*.